[Cite as *McCoy v. McCoy*, 2019-Ohio-5227.]

MCOURT OF APPEALS
GUERNSEY COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| KAREN SUE MCCOY, TRUSTEE AND INDIVIDUALLY | : | JUDGES: |
| | : | Hon. John W. Wise, P.J. |
| | : | Hon. Craig R. Baldwin, J. |
| Plaintiff-Appellee | : | Hon. Earle E. Wise, Jr., J. |
| | : | |
| -vs- | : | |
| | : | |
| EMILY ANN MCCOY | : | |
| | : | |
| Defendant - Appellee | : | |
| | : | |
| BRANDON MCCOY AND CAMERON MCCOY | : | |
| | : | Case No. 19 CA 05 |
| | : | |
| Defendant-Appellant | : | O P I N I O N |

CHARACTER OF PROCEEDING:          Appeal from the Court of Common
                                 Pleas, Case No. 17PV053117

JUDGMENT:                        Affirmed

DATE OF JUDGMENT:                December 12, 2019

APPEARANCES:

For Plaintiff-Appellee                    For Defendant-Appellant

BRENT STUBBINS                            C. JOSEPH MCCOY
GRANT J. STUBBINS                         WILLIAM S. MCCOY
59 North Street                           57 East Main Street
P.O. Box 488                              Newark, OH  43055
Zanesville, OH  43702

For Appellee Emily Ann McCoy
BRYAN CONAWAY
126 North Ninth Street
Cambridge, OH  43725-1997

*Wise, Earle, J.*

{¶ 1}   Defendant-appellants Brandon McCoy and Cameron McCoy appeal the February 1, 2019 judgment of the Guernsey County Probate Court which found plaintiff-appellee Karen Sue McCoy properly revoked and terminated a 1997 trust created by herself and her deceased husband Dick McCoy, and properly withdrew the assets of the trust.

## FACTS AND PROCEDURAL HISTORY

{¶ 2}   This dispute involves the interpretation of an A-B-C trust (the trust) created by appellee and her husband Dick McCoy on October 8, 1997. Dick and appellee are both grantors and trustees of the trust. Appellants Brandon and Cameron are Dick's sons from a previous marriage. Appellant and Dick had one child in common, Emily McCoy who is not a party to this appeal.

## BACKGROUND

{¶ 3}   Appellee and Dick married in 1989. During their marriage, Dick grew a hardware business – Orme Hardware -- with the assistance of his father and the financial assistance of appellee and appellee's father.

{¶ 4}   In 1997, when the trust agreement was created, Dick co-owned one Orme Hardware store location along with his two brothers. Also at that time, the federal estate tax exclusion was $600,000, resulting in a taxable event only for estate assets exceeding that amount. The main purpose of the trust was to minimize tax liability of the couple's estate upon their deaths.

{¶ 5}   On March 11, 2016 Dick McCoy died leaving appellee as executrix of his estate. By that time, Dick had bought out his brothers and expanded Orme Hardware to

seven locations which he and appellee managed and operated together. The inventory filed in Dick's estate listed all shares of Orme Hardware Company as intangible property valued at $1,792,898.00. Appellee transferred those shares into the trust as directed by Dick's last will and testament. As of the date of Dick's death, the estate tax credit had been increased from $600,000 to $5,450,000.

## LITIGATION BEGINS

{¶ 6}   Six months after Dick's death, on September 8, 2016, appellee revoked the trust, and transferred all shares of Orme Hardware to herself. Upon learning of this transfer, appellants sent appellee a letter challenging her authority to do so. In response, on October 26, 2017, appellee filed a declaratory judgment complaint. On November 28, 2017, she filed an amended complaint. Appellee set forth four alternative claims. In her first claim, appellee argued she was entitled to an order declaring she validly terminated the trust pursuant to Article One of the trust, and validly transferred all of the Orme Hardware to herself, free from any claims of the trust.

{¶ 7}   Appellee next alternatively argued she was entitled to an order declaring she validly received one half of the Orme stock outright from Trust A, pursuant to Article II (A)(2) of the trust, which addresses the death of either grantor, and the remaining half was validly distributed to her from Trust C, pursuant to Article II (E), as Trust C is for the benefit of the surviving grantor, free of any claims of the trust.

{¶ 8}   In her third alternative claim, appellee argued she was entitled to an order declaring pursuant to Article II(C) of the trust, that she validly reallocated the shares of Orme Hardware stock into Trust C. As a sub-alternative argument in this vein, appellee argued because no federal or state estate tax liability existed due to changes in IRS rules,

the trial court should reform the trust to provide for the placement of Orme Hardware stock into Trust C, without reduction of its assets to Trust B, permitting appellee to distribute the assets to herself, free of any claims of the trust.

{¶ 9}   Finally, in her fourth alternative claim, appellant argued the shares of Orme Hardware stock should have been categorized are tangible, as opposed to intangible property in the estate inventory. Then, since Dick's will bequeathed to appellee all tangible personal property of the estate, appellant would become the sole owner of Orme Hardware.

{¶ 10} On December 11, 2017, appellants filed an answer to appellant's complaint for declaratory judgment as well as counterclaims for tortious interference in the expectancy of an inheritance, breach of trust and declaratory judgment. In their request for declaratory judgment, appellants asked the trial court to issue an order declaring that the trust agreement requires up to $5,450,000 in assets be transferred to Trust B, and held in Trust B pursuant to the terms of the trust agreement for appellee's lifetime, and then distributed to appellants and Emily McCoy upon appellee's death.

{¶ 11}   On April 9, 2018, appellants filed a motion for summary judgment in their favor as to one of appellee's claims. On October 18, 2018, appellee filed a motion for partial summary judgment in her favor as to appellant's claims of tortious interference in the expectancy of inheritance and breach of trust. On December 12, 2018, the trial court denied appellant's motion and granted appellee's motion for partial summary judgment. The declaratory judgment matter was set for a bench trial.

DECLARATORY JUDGMENT TRIAL

{¶ 12} The trial was held on December 18, 2018. Brandon and Cameron both testified. Cameron indicated he was never involved in the hardware business. He stated he and his father had one conversation in 2012 regarding whether Cameron desired to work at Orme Hardware. Cameron declined, stating he was happy with his career trajectory in teaching. According to Cameron, his father told him the door would always be open should he change his mind, and that he, Brandon, and Emily were set to "inherit these."

{¶ 13} Brandon testified he began working for his father in 2012. Dick sent Brandon to a 4-month program through the National Hardware Retail Association so Brandon could gain a better understanding of office skills, human resources, and customer service. In an e-mail to the Association as Brandon's sponsor for the program, Dick stated the course could be used by Brandon on the job "and ultimately will be of great benefit to our company and his future." Brandon took this to mean he would be "part of that succession plan, part of the next in line." He further testified that in April 2014, Orme obtained a key man life insurance policy for him. Brandon believed this signified that he held an important role within the company.

{¶ 14} In July 2014, Dick purchased the Arcanum store. At trial, Brandon introduced a local newspaper article about the purchase which included a photo of Dick and Brandon titled "New Owners Dick and Brandon McCoy." Brandon explained this was because he was "heavily involved with the company and involved in discussions with my father to acquire this location." He admitted however, that he never personally put any money into the endeavor.

{¶ 15} Before Dick's death, Brandon was managing the stores located in Newark and Arcanum, making $25 an hour, driving a company vehicle, and using a company gas card. Immediately following Dick's death, Brandon and appellee had a conversation in front of Cameron and his wife regarding closing the stores for Dick's funeral, at which time appellee stated "The stores are yours, you figure it out." Brandon took this to mean all the stores had passed to him upon his father's death. His belief stemmed in part from the fact that in 2014, Dick consulted with a strategic tax planning firm to look into a succession plan and had discussed the matter with Brandon. Dick told Brandon he was looking into the matter so that Brandon "may have the business one day." Brandon admitted, however, that his father never went through with the succession plan, and admitted on cross-examination that appellee did not gift the stores to him after his father's death. Brandon further testified that he had an agreement with his father to buy Orme Hardware, but admitted they never discussed price, nor were there any contracts or promises. According to Brandon, these conversations took place in 2014, and no further conversations on the subject ever took place.

{¶ 16} Sometime after Dick's funeral, appellee asked Brandon to develop a business plan for the Newark and Arcanum stores. She advised that if it was good enough, he could keep his job. Instead of working on a business plan, however, Brandon testified he went home and worked on his resume and an exit plan. A month later, Brandon had a meeting with appellee and two other Orme Hardware board members who advised Brandon his business plan was inadequate. He was given the option to quit, be fired, or to work under a manager at a store 70 miles away from his home at minimum wage and without a gas card. Brandon stated he worked at that store for 3 days before

asking appellee if he could be laid off so that he could collect unemployment, Appellee granted his request.

{¶ 17} Appellee testified that she met Dick in 1988 and they married in 1989. When the trust was executed, they did not yet own anything. Dick acquired the Cambridge Orme Hardware store in 2007, which was the only store at the time. Dick's father had previously divided all the shares of Orme Hardware between Dick and his two brothers. In 2007, Dick and appellee used appellee's inheritance from her grandfather to buy out Dick's brothers. Before the buyout, Dick's parents had deeded the property upon which the Cambridge store is situated to appellee. She remains the owner of that property.

{¶ 18} As for the trust, appellee stated its sole purpose was to avoid paying estate taxes, and that upon advice from an attorney, she believed the trust was revocable, and believed she acted within her authority when she revoked the trust and withdrew its assets.  Appellee's understanding of the trust was that the surviving spouse would take all, and upon the surviving spouse's death, the children would then be the beneficiaries of any remaining assets. She additionally testified the trust contains a second-to-die insurance policy that was valued at $500,000 at the time of the hearing. This policy is for the benefit of the 3 children, but appellee testified she was considering allowing the policy to lapse. Its purpose in 1997, she said, was for the children to have something should she and Dick meet a common untimely death while the children were still minors, as they had few assets at the time.

{¶ 19} Appellee additionally testified as to her conversations with Dick just before his demise. Asked what she should do with the stores, Dick told her that was for her to

decide. In discussing Brandon's role, Dick advised appellee "You know, he doesn't know a damn thing. I can't teach him anything. But you can give him a chance if you want."

{¶ 20} Appellee explained that Brandon had been working mostly at the Arcanum and Newark stores which were to be his focus. After Dick's death the board of directors had questions for Brandon that Brandon could not answer. Her father-in-law, who sits on the board, advised she needed to fire Brandon. She asked the board if she could send Brandon to another store to work under her best manager in hopes he would learn how to run a store. This, according to appellee is why Brandon was transferred and his pay cut. She wanted to keep him and the board wanted to fire him. She did, however, permit him to keep a company truck and credit card. Appellee testified Brandon worked for 5 days before he decided he could not accept these terms and quit. Appellee nonetheless allowed him to collect unemployment.

{¶ 21} Asked about the conversation regarding closing the stores for Dick's funeral, appellee explained she merely meant that since Brandon was managing the Arcanum and Newark stores, it was his decision as to whether they would be closed for Dick's funeral. She did not gift him any stores, nor did he offer to buy any stores.

{¶ 22} On cross-examination, appellee identified appellant's exhibit 1, the succession plan referred to by Brandon. According to the document Dick hired a strategic tax advisor in 2013 and indicated he would like to transfer the business to Brandon within the next 10 years with as little tax consequence as possible to himself, Brandon, and Orme. Appellee stated she and Dick had discussed the succession plan. She explained that Dick was trying to protect Brandon as he was seen as the child who would need the most help to take care of himself and his family. At some point, Brandon had stated he

did not want to work for his father. He then tried teaching, but when that did not go well for him, Dick asked Brandon if he wanted to come into the business. The plan indicated Dick would not be giving Brandon the business, but rather Brandon would be buying the business. Dick paid $11,600 toward formulation of the $40,000 plan, but then never followed through with completion of the plan. Appellee stated Dick wanted to believe the best in Brandon, and was hoping for the best in Brandon. But as time went on, he realized Brandon was incapable of attaining appropriate business goals.

{¶ 23} The portion of the succession plan that was completed indicated Dick and appellee had a revocable living trust.

{¶ 24} John Bennett testified on behalf of appellants. Bennett worked for Dick for 11 years handling accounts payable. He stated that during that time, appellee never held a management position, but rather only handled money transfers. He confirmed that appellee's father loaned Dick the money to purchase the Arcanum store because Dick could not get a bank loan. He further confirmed that Dick never paid for completion of the succession plan.

{¶ 25} Bennett testified Dick never gave him any indication he was displeased with Brandon's work. He further stated that Dick once told him that appellee and Emily would be well cared for through appellee's family should something happen to him, and that he "wanted the boys to get something out of this." Bennett clarified that he did not know about the succession plan until after Dick's passing. He found the document while cleaning out a safe and read though it once. It appeared to Bennett that Dick was planning to retire at 70. Bennett did not know if he named anyone to take over the business. In Bennett's opinion, "Brandon knew more about the hardware business than anyone else."

He indicated that Brandon did everything his father asked him to do, but was then demoted after Dick died. He testified that following Dick's passing, he heard appellee tell another employee she needed to "break the trust." On rebuttal, appellee denied this allegation.

{¶ 26} At the conclusion of testimony, counsel for both sides opted to submit closing argument in writing and further to submit proposed findings of fact and conclusions of law.

{¶ 27} On February 1, 2019, the trial court issued its judgment entry adopting appellee's findings of fact and conclusions of law as its own. The court concluded (1) the trust gave appellee the authority to revoke the trust and withdraw its assets; (2) appellee acted properly and upon the advice of counsel in revoking and terminating the trust, and (3) appellee is now the sole owner of Orme Hardware.

{¶ 28} Appellants filed an appeal and the matter is now before this court for consideration. They raise two assignments of error as follow:

I

{¶ 29} "THE TRIAL COURT ERRED BY CONCLUDING THAT THE TRUST AGREEMENT GIVES KAREN AUTHORITY TO REVOKE THE TRUST AND WITHDRAW ITS ASSETS."

II

{¶ 30} "THE TRIAL COURT ERRED BY CONCLUDING THAT KAREN IS NOW THE SOLE OWNER OF THE STOCK OF ORME HARDWARE AND THAT SHE ACTED PROPERLY AND UPON ADVICE OF COUNSEL IN REVOKING AND TERMINATING THE TRUST AND WITHDRAWING ITS ASSETS."

I, II

{¶ 31} We address appellant's assignments of error together. Appellants argue the trial court erred by finding appellee had the authority to revoke the trust and withdraw its assets. Appellants further argue this finding was against the manifest weight of the evidence. We disagree.

STANDARD OF REVIEW

{¶ 32} We review an appeal from a declaratory judgment de novo. Per the Supreme Court of Ohio in *Arnott v. Arnott*:

> The determination of the meaning of the disputed language of the trust at the heart of this case is a question of law. "A court's purpose in interpreting a trust is to effectuate, within the legal parameters established by a court or by statute, the settlor's intent." *Domo v. McCarthy*, 66 Ohio St.3d 312, 612 N.E.2d 706 (1993), paragraph one of the syllabus. Interpreting a trust is akin to interpreting a contract; as with trusts, the role of courts in interpreting contracts is "to ascertain and give effect to the intent of the parties." *Saunders v. Mortensen*, 101 Ohio St.3d 86, 2004-Ohio-24, 801 N.E.2d 452, ¶ 9. This court has held that "[t]he construction of a written contract is a matter of law that we review de novo." *Id*. The same is true of the construction of a written trust; in both *In re Trust of Brooke*, 82 Ohio St.3d 553, 697 N.E.2d 191 (1998), and *Natl. City Bank v. Beyer*, 89 Ohio St.3d 152, 729 N.E.2d 711 (2000), this court applied a de novo

standard of review in interpreting trust language in appeals of declaratory judgments.

132 Ohio St.3d 401, 2012-Ohio-3208, 972 N.E.2d 586 ¶ 14.

## REVOCABLE OR IRREVOCABLE?

### Dick McCoy's Will

{¶ 33} This dispute hinges upon whether the trust agreement was revocable or irrevocable. Appellants state the judgment entry being appealed does not specify if the trust authorizes appellee's actions or if the trial court reformed the agreement. Our examination of the judgment entry reveals the trial court clearly found the trust agreement granted appellee the authority to revoke the trust and withdraw its assets. Judgment Entry, February 1, 2019, page 5. We therefore confine our analysis to appellant's arguments regarding whether or not the trust granted appellee that authority. Appellants argue appellee did not have the authority to revoke the trust agreement for two reasons; first because it was created before 2007 and is therefore irrevocable unless it expressly provides otherwise, and second because appellee was not the grantor with respect to the Orme Hardware stock, she had no authority to withdraw said shares.

{¶ 34} Appellants argue the trust is unambiguous, and we agree. However, we find it unambiguously grants appellee the authority to revoke the trust and withdraw its assets.

{¶ 35} When Dick passed, Trust A was funded per the directives of his will with property held in Dick's name. The relevant portion, of the will, Item III, states:

A. All the rest, residue and remainder of my property, of whatsoever kind and wheresoever situated (herein referred to as my "residuary estate"), I give, devise and bequeath to the Trustee, in augmentation of the property held by the Trustee under the terms of the Agreement of Trust referred to above.

B. My intention is to identify said Agreement of Trust, but not to incorporate the same by reference into this Will, nor to cause my residuary estate, after the delivery thereof to the Trustee under the Agreement of Trust to be subject to the jurisdiction of the Probate Court, but to add such residuary estate to the property constituting the trust estate under the Agreement of Trust. However, if for any reason a court of competent jurisdiction shall declare this bequest and devise to said Trustee to be invalid, then I give, devise and bequeath all of the said residuary estate to Trustee, to serve without bond, to be held, managed and distributed in exactly the same manner as described in said existing Agreement of Trust, which under such circumstances I do herby incorporate by reference into this Will.

## THE TRUST AGREEMENT

### Relevant Portions

{¶ 36} Article One of the trust creates Trust A. That section states:

A. INTEREST IN TRUST DURING GRANTOR'S LIFETIME: Unless otherwise indicated below, the entire trust estate shall be held and administered by Trustees as Trust A. During the lifetime of either Grantor, the Grantors shall have a retained life interest in all the items of the trust estate of Trust A and the Trustees shall pay to or for the benefit of the Grantors all of the net income derived from the assets of Trust A on monthly or other convenient installments, but not less frequently than annually. * * *

{¶ 37} Section B of Article One sets forth certain rights retained by grantors. Relevant here are sections Article One (B)(2) and (3) which states grantors retain the rights to:

2. Withdraw from time to time, from the operation of the Agreement of Trust, portions *or all* of said assets and property at any time Constituting Trust A and when so withdrawn, such assets and property shall be free of all trusts created or arising by virtue hereof; and

3. *Revoke*, alter or amend this Agreement of Trust *with regard to Trust A, in part on in its entirety*, and if such Agreement is revoked in its entirety, to pay Grantors or to order of Grantors *all* of said assets and property, together with accumulated net income, if any, then

constituting the trust estate of Trust A free of all trusts created or arising hereunder.

Emphasis added.

{¶ 38} This language gives appellee a life interest in Trust A, but yet the power to proceed exactly as she did – to revoke Trust A and withdraw its assets. However, Article Two of the trust addresses administration of the trust upon the death of a grantor. Article Two (A)(2) addresses the situation here:

> 2. IF EITHER GRANTOR SURVIVES THE OTHER GRANTOR BY SIX MONTHS: After the death of either Grantor (deceased Grantor), and if the other Grantor (surviving Grantor) survives the deceased Grantor for a period of six months or more, the Trustee, as of the date of the deceased Grantor's death, shall set aside from Trust A as a separate trust designated as Trust C for the benefit of the surviving Grantor and amount equal to one-half of the entire trust estate of Trust A (as the same shall be constituted after being (i) augmented by property received or to be received as a consequence of the deceased Grantor's death, including, without limitation, any property received or to be received under the terms of the deceased Grantor's Last Will and Testament and/or Codicil thereto, (ii)

depleted by the property set aside for Trust B pursuant to the provisions of Paragraph B and C of this Article Two * * *

{¶ 39} This section directs appellee, who survived Dick by six months, to deposit half the value of Trust A in to Trust C, Trust C being for appellee's own benefit but depleted by an amount set aside for Trust B pursuant to Article Two, paragraphs B and C which state:

B. PROPERTY TO BE SET ASIDE FROM TRUST C: The property placed in Trust C shall be reduced by an amount *if any, needed* to increase the deceased Grantor's taxable estate (for federal estate tax purposes) to the largest amount that, after allowing for the unified credit against the federal estate tax and the state death tax credit against such tax (but only to the extent that the use of such state death tax credit does not increase the death tax payable to any state) will not result in a federal tax being imposed on the deceased Grantor's estate based solely upon the amount of the estate transfer to Trust B. All such property shall be set aside in Trust B to be held as described below in Article Three.

Emphasis added.

{¶ 40} Article Two paragraph C states:

C. GENERAL PROVISIONS RELATING TO TRUST C: With respect to the forgoing Paragraph B of this Article Two, it is Grantors' intention that all federal estate tax credits available to either Grantor's estate, including, but not limited to, the federal credit for state death taxes under Section 2001 of the Internal Revenue Code be considered for the maximum extent available in determining the amount allocable under the forgoing Paragraph B, even if in so doing a federal tax liability is created. For purposes of the forgoing Paragraph B and this Article Two, the terms "taxable estate," "adjusted taxable gifts," "federal estate tax," and "credits against the federal estate tax" and any references thereto shall be defined and/or computed as provided in Chapter 11, Internal Revenue Code. The words "Internal Revenue Code" and all references thereto shall mean the Internal Revenue Code of 1986, as amended. The part of the trust estate set aside pursuant to the provisions of the foregoing Paragraphs A and B of this Article Two as a separate trust for the benefit of surviving Grantor shall be known as Trust C. The Trustee for Trust A shall be set forth in Article Seven thereof.

{¶ 41} Article Seven simply indicates trustees under the agreement shall be the trustees named at the beginning of the agreement – Dick and appellee – "who shall each

have the authority to act on behalf of the Trust" unless either is unwilling or unable to serve or continue to serve.

{¶ 42} Thus upon the date of Dick's death, half of the Orme stock remained in Trust A and half flowed to Trust C.

{¶ 43} Paragraphs D and E of Article Two address the administration of Trust C following the death of the deceased Grantor. Like Trust A, Paragraph D states the surviving Grantor shall have a life interest in all items of Trust C, but paragraph E states the Trustee is authorized "to pay to or for the benefit of the surviving Grantor *all* of the principal or such portions of the principal of Trust C as the surviving Grantor may from time to time request." Emphasis added.

{¶ 44} While the trust does direct Trust B to be funded with as much property as possible without incurring federal estate tax liability, due to a change in the federal estate tax exclusion between the time appellee and Dick created the trust and Dick's death, the estate here incurred no federal estate tax liability and there was no need to shelter any of the assets of the trust from federal tax liability. Per Article two paragraph B, it was not necessary to reduce Trust A by any amount to fund Trust B. Thus Trust C contains half the property from Trust A and appellee was empowered by the terms of the trust to revoke Trust A and withdraw its assets, and to withdraw all of the assets of Trust C.

{¶ 45} Still, appellants characterize Trust B as a bypass trust and argue it was to be used to shelter as much of Dick's estate as possible for their future inheritance. They support this argument by pointing to Article Three Section A of the trust. That section reads in relevant part:

A. ADMINISTRATION OF TRUST B. The trustee shall set aside and pay into a separate fund to be known as Trust B, all of the assets received by Trustee as a consequence of the death of the *surviving* Grantor *and* all assets *directed to Trust B* by this agreement, or otherwise, including all assets and interests in assets, *if any*, received by Trustee under the provisions of the deceased Grantor's Last Will and Testament and Codicils thereto * * *.

Emphasis added.

{¶ 46} This section refers to the procedure to be followed upon appellee's death, by a successor trustee and directs any assets received as a consequence of appellee's death be directed to Trust B along with all assets directed to Trust B as a result of Dick's death. But again, due to changes in federal estate tax, it was not necessary to fund Trust B when Dick passed away.

{¶ 47} Thus, the trust unequivocally grants appellee the right to revoke Trust A, and the ability to request all of the principal of Trust C. We therefore find appellee acted within her powers as set forth in the trust agreement.

{¶ 48} As for appellant's argument that appellee was not the grantor of the Orme stock and thus has no revocation rights in regard to the stock, we note appellants presented no testimony as to whether the stock was traceable solely to Dick. Conversely, appellee testified it was her inheritance from her grandfather that permitted she and Dick to buy out Dick's brothers to begin growing Orme Hardware, the financial assistance of

her family that made the purchase of the Arcanum store possible, and that she and Dick owned and managed the stores together. We therefore reject appellants' sole grantor argument.

{¶ 49} Although we find the trial court did not reform the trust, and that the Trust agreement is unambiguous and speaks for itself, we address appellants' manifest weight arguments for the sake of thoroughness. On review for manifest weight, the standard in a civil case is identical to the standard in a criminal case: a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine "whether in resolving conflicts in the evidence, the jury [or finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction [decision] must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). In *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting Black's Law Dictionary 1594 (6th Ed.1990), the Supreme Court of Ohio explained the following:

> Weight of the evidence concerns "the inclination of *the greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find *the greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its *effect in inducing belief*." (Emphasis sic.)

{¶ 50} In weighing the evidence, however, we are always mindful of the presumption in favor of the trial court's factual findings. *Eastley v. Volkman*, 132 Ohio St .3d 328, 2012-Ohio-2179, 972 N.E.2d 517.

{¶ 51} Appellants place a good deal of weight on the incomplete succession plan. This piece of evidence, however, cuts both ways for appellants. It demonstrates that at one time Dick had considered a succession plan, but also demonstrates that he abandoned the idea, even after spending a significant amount of money towards its completion. So too, Dick's death was not sudden, but rather the result of an extended illness. He could have amended the trust but did not.

{¶ 52} Appellants also spend a good deal of their brief rehashing how Brandon was treated following his father's death, and what their own expectations were based on a few comments made by Dick in 2014. These events, however, had little to do with the issue before the trial court and now before us – whether or not appellee had the authority to revoke the trust and withdraw its assets. We have found above that the trust speaks for itself, and granted appellee the authority to proceed exactly as she did, and we further find in any event, the trial court's finding was not against the manifest weight of the evidence.

{¶ 53} The judgment of the Guernsey County Probate Court finding appellee acted within her properly granted authority under the 1997 Trust Agreement, is affirmed.

By Wise, Earle, J.,

Wise, John, P.J, concurs separately and

Baldwin, J., dissents.


EEW/rw

*Wise, J., concurring*

**{¶54}** I concur with the majority opinion. I write separately, as I do not base my opinion on the extraneous facts pertaining to the lives of the parties prior to the death of the grantor. The document speaks for itself, even if it is somewhat slurred in its speech. The trust language is not as clear as it could be in expressing its purpose. As the majority notes, there is nothing indicating it was drawn for the purpose of protecting assets for the grantor's heirs. The trust provisions in question speak to tax consequences and the desire to minimize any such tax consequences.

**{¶55}** The key words in the trust are found in Article Two Section B. The words "if any, needed" either refer to the overall **need** to secure maximum tax savings or are simply a mathematical formula used to fund Trust B without purpose of tax savings. If the grantors simply wanted to leave an amount to their heirs, they could have done so without need to reference any mathematical formula related to estate taxes. Due to the change in the tax laws from the date of the creation of the Trust, there was a significant change in the amount that would be transferred to Trust B. Whether or not the Grantors knew of the changes would be pure speculation on the part of this Court. Because it would be speculation, an analysis of the resulting changes on the Trust is unnecessary. Whether having that knowledge the grantors impliedly approved the resulting change as to the effects of that clause on the trust is also unnecessary.

**{¶56}** The analysis of the purpose of the Trust begins and ends on the date the Trust was created. I read the language "if any, needed" to refer to the minimization of any tax implications to the "entire estate". Because I believe that is the proper reading of the purpose of the Trust, I would find it was unnecessary to deplete Trust C by any

amount. No amount was "needed" to be transferred to Trust B to secure any tax savings for the grantor's estate.

**{¶57}** I would therefore find that the ½ share of Trust A which went to Trust C should not be depleted by any amount. Appellee therefore had the right to use the assets in Trusts A and C in any way she deemed proper per the authority granted the trustees in Trusts A and C.

**{¶58}** I therefore concur in the results of the majority opinion and would affirm the decision of the trial court.

*Baldwin, J., dissenting*

{¶59} I respectfully dissent from the majority's decision that Appellee had the authority to revoke the Trusts and withdraw the assets. I would find that the pertinent language in the Trust Agreement, Article Two, Paragraph B, is still valid and enforceable despite the absence of a tax liability for the deceased grantor's estate, that the language requires funding of Trust B, and that Trust B is irrevocable.

{¶60} The majority concludes that "while the trust does direct Trust B to be funded with as much property as possible without incurring federal tax liability" a change in the tax law renders that requirement unnecessary as there was no need to shelter any of the trust assets from federal tax liability. The majority also rejects the argument that Article Three, paragraph A has any impact as it "refers to a procedure to be followed upon appellee's death" and thus has not yet been triggered. I believe the majority has misinterpreted both provisions.

{¶61} Article Two, Paragraph C serves only as a limit to the amount of the assets that should be transferred from Trust A to Trust B. The trust agreement clearly requires that a sum be transferred to Trust B in an amount that does not result in a federal tax liability to decedent's estate. The fact that a change in the law has eliminated the federal tax liability does not alter the requirement of the transfer, but it does eliminate the limitation. The same result would have occurred if, instead of eliminating the estate tax, the limit was raised sufficiently to eliminate any tax consequence.

{¶62} The majority emphasizes the reference to the phrase "an amount *if any, needed* to increase the deceased Grantor's taxable estate" in the first sentence in Article Two, Paragraph B and concludes that because there was no tax liability there was no

need to transfer any funds to Trust B.  I find that this language provides another boundary for the transfer and does not eliminate the need to make the calculation.  The amount of funds to be transferred to Trust B would be zero if the amount of the estate equaled or exceeded the unified tax credit against federal tax without considering the funds to be transferred

{¶63}  Because the change in the law eliminated any tax consequence for the estate, I would find that the trial court erred and  that Trust B must be funded with at least one half of the assets currently held in Trust A and that Trust B is irrevocable because the trust agreement does not expressly provide that Trust B is revocable.

{¶64}  I also disagree with the majority's interpretation of Article Three, Paragraph A.  The majority concludes that "This section refers to the procedure to be followed upon appellee's death, by a successor trustee***," but that section contains no such express limitation.   While it does state that "all of the assets received by Trustee as a consequence of the death of the surviving grantor" shall be placed in Trust B, it does not limit its effectiveness to the death of Appellee.  That paragraph describes sources of assets that shall be paid into Trust B and the balance of the paragraph addresses the administration of Trust B.   I would find that the reference to the surviving grantor is only a description of one source of assets for Trust B and not a limitation of the existence of that Trust.

{¶65}  I would find that the Grantor's intent to create and fund Trust B, limited by tax consequences, is manifest from the words and phrases in the document and the fact that the law has changed does not impact that intent. *Henson v. Casey*, 4th Dist. Pickaway No. 04CA9, 2004-Ohio-5848, ¶ 11. For that reason I respectfully dissent from the

majority's finding that the Appellee had authority to revoke the Trust and withdraw funds

and that the court's decision was not against the manifest weight of the evidence.